**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **RANDALL K. MUSICK OBO** | ) | |
| **ANGELA B. WATSON (MUSICK)** | ) | |
| **DECEASED,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12cv00073 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Randall K. Musick, ("Mr. Musick"), on behalf of Angela B. Watson Musick, deceased,[1] ("Musick"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that Musick was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Mr. Musick reports that Musick died on December 15, 2011. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 2.)

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Musick protectively filed her current application for SSI on September 13, 2007, alleging disability as of September 13, 2007, due to "nerves," asthma, hepatitis C, depression and anxiety.[2] (Record, ("R."), at 121-23, 140, 146, 151, 180.) The claims were denied initially and on reconsideration. (R. 79-80, 82-84, 190-98.) Musick then requested a hearing before an administrative law judge, ("ALJ"). (R. at 73-74.) A hearing was held on August 16, 2010,[3] at which Musick was represented by counsel. (R. at 44-70.)

By decision dated March 23, 2011, the ALJ denied Musick's claim. (R. at 27-36.) The ALJ found that Musick had not engaged in substantial gainful activity since September 13, 2007, the date of her application. (R. at 29.) The ALJ found

---

[2] The record shows that Musick was previously awarded disability benefits pursuant to a March 1995 decision, and that these benefits were terminated in February 2007 when Musick was incarcerated. (R. at 46-47, 147, 167.)

[3] The ALJ originally scheduled Musick's hearing on May 20, 2010, but continued it because her attorney had not been notified of the hearing. (R. at 38-43.)

that the medical evidence established that Musick suffered from severe impairments, namely myalgias/back pain, a positive hepatitis C antibody, gastroesophageal reflux disease, asthma/chronic obstructive pulmonary disease, depression, anxiety and history of polysubstance abuse, in remission, but he found that Musick did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) The ALJ found that Musick had the residual functional capacity to perform a limited range of simple, routine, repetitive light work[4] that did not require more than occasional climbing of ramps and stairs, that did not require her to work around hazardous machinery, excessive fumes, dust or temperature extremes, that did not require more than frequent reaching, that did not require more than occasional stooping, bending and kneeling, that did not require her to climb ladders, ropes or scaffolds, that did not require her to work jobs requiring food preparation or other jobs affected by hepatitis C, that allowed her to take a break every two hours and that did not require her to have direct contact with the public. (R. at 33.) The ALJ found that Musick had no past relevant work. (R. at 35.) Based on Musick's age, education, lack of work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Musick could perform jobs existing in significant numbers in the national economy, including jobs as a general office worker and a housekeeper/cleaner. (R. at 35-36.) Therefore, the ALJ found that Musick was not under a disability as defined under the Act and was not eligible for benefits. (R. at 36.) *See* 20 C.F.R. § 416.920(g) (2013).

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2013).

After the ALJ issued his decision, Musick pursued her administrative appeals, (R. at 20-22), but the Appeals Council denied her request for review. (R. at 1-5.) Mr. Musick then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2013). The case is before this court on Mr. Musick's motion for summary judgment filed May 20, 2013, and the Commissioner's motion for summary judgment filed June 24, 2013.

## *II. Facts*

Musick was born in 1968, (R. at 121, 146), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She obtained her general equivalency development, ("GED"), diploma, and had no past relevant work experience. (R. at 65, 155.) Musick testified that she did not have a driver's license. (R. at 52.) She stated that she lost her driving privileges when she was 20 years old after being charged with drinking and driving. (R. at 52.) Musick stated that she stayed physically exhausted as a result of having hepatitis C. (R. at 56.) She stated that she suffered from chronic asthma for which she used an inhaler daily. (R. at 57-58.) Musick stated that it was difficult for her to be around cleaning agents and fumes. (R. at 58.) She stated that she suffered from depression and problems with her "nerves." (R. at 59.) She attributed her depression and anxiety to the physical abuse she endured during her lifetime. (R. at 59.) Musick stated that she did not like being around people and that she left her home only to go to counseling. (R. at 59-60.)

Annmarie Cash, a vocational expert, also was present and testified at Musick's hearing. (R. at 54-55, 64-68.) Cash was asked to assume a hypothetical individual of Musick's age, education and lack of past relevant work who had the residual functional capacity to perform routine, repetitive light work that did not require her to climb ropes, scaffolds or ladders, that did not require her to work around heights, hazards or dangerous machinery, that did not require her to use automotive equipment in the performance of work activity, that did not require her to climb or crawl, that did not require her to work around fumes, dust or temperature extremes, that did not require her to deal with the public directly, that did not require her to perform food work preparation or any other job that someone with hepatitis C would be barred from, that required no more than occasional bending, stooping, moving, kneeling or frequent reaching, that would allow a 10- to 15-minute break at two-hour intervals and that would allow her to miss, on average, 13 to 18 days of work a year. (R. at 64-65.) Cash stated that there would be jobs available that such an individual could perform, including jobs as a housekeeper and a general office clerk.[5] (R. at 65-66.) In particular, Cash referred to the Dictionary of Occupational Titles, ("DOT"), occupational codes, specifically identifying the housekeeper jobs, found at 302.685-010, and the general office clerk jobs, found at 294.667-010. (R. at 65-66.) Cash stated that there were 338,044 housekeeping jobs in the U.S. economy and 15,000 in the regional economy. (R. at 66.) Cash stated that there were 331,103 general office clerk jobs available in the U.S. economy and 5,000 in the regional economy. (R. at 66.) Cash stated that Musick would be able to perform the housekeeping jobs because she

---

[5] Cash initially identified laundry and dry cleaning jobs, but the ALJ gave Musick the benefit of the doubt and dismissed that job as one that she could not perform. (R. at 66-67.)

would not be working around concentrated exposure to cleaning fumes and dust. (R. at 66-67.)

In rendering his decision, the ALJ reviewed records from Dr. Ravi Titha, M.D.; Southwest Virginia Alcohol Treatment Program; Cumberland Mountain Community Services; Carilion New River Valley Medical Center; Department of Corrections; Dr. Mina Patel, M.D.; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; The Laurels; Dr. Michael Hartman, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Omobola O. Oduntan, M.D.; Dr. Pablo M. Carpio, M.D.; and Community Medical Care 1.

Musick had an extensive history of drug addiction and alcohol use. (R. at 48-49.) She became addicted to opiates when she was nine years old.[6] (R. at 344.) In addition to opiates, her substance use involved, over time, marijuana, cocaine, acid, "crystal meth," nonprescription methadone and Xanax, as well as binge drinking alcohol. (R. at 250-51.) Musick attempted detoxification on at least six occasions between April 1989 and February 1994. (R. at 223-46.) Musick's probation officer referred her for treatment in August 2005 after her drug screen was positive. (R. at 247-57.) In September 2005, Musick was hospitalized for three days after she complained of increasing depression that developed after she had run out of her pain medication for the previous three months and had no methadone available to her; upon her admission, she denied any substance use. (R. at 282-91.) She was

---

[6] While the mental health notes do, in fact, state this, it appears to be an error. Instead, Musick most likely stated that she became addicted to opiates "nine years ago." Such a statement is supported by an August 2005 assessment form at Cumberland Mountain Community Services in which she stated that she started using opiates when she was about 22 years old. (R. at 250.)

discharged with a diagnosis of improved recurrent, severe major depressive disorder, without psychosis, history of polysubstance abuse, in partial remission per Musick, history of treatment noncompliance and borderline personality traits. (R. at 283.)

Otherwise, Musick routinely did not show for her appointments for either the substance abuse group or the moral reconation therapy, ("MRT"), group meetings, and she was incarcerated in November 2005. (R. at 261-80.) She was prescribed medication upon her incarceration. (R. at 344.) She worked in a store room while imprisoned[7] and said that she enjoyed the work. (R. at 340.) She self-discontinued using Prozac in September 2006, and she continued reporting that she was doing well. (R. at 340.) Therefore, Prozac was officially discontinued given her stability from a psychiatric standpoint. (R. at 340.) Musick did not seek ongoing mental health treatment during the remaining portion of her incarceration. (R. at 294-319.) In July 2007, Musick underwent a physical examination prior to her release from incarceration, and it was noted that she appeared healthy. (R. at 335-38.)

Treatment notes from Dr. Pablo Carpio, M.D., show that Musick was seen for conservative treatment for gastroesophageal reflux disease, depression, headaches and asthma sporadically between November 2000 and February 2003. (R. at 612-23.)

---

[7] Musick was incarcerated on multiple occasions for charges involving OxyContin distribution, petit larceny, destruction of private property, obstruction of justice and violation of her probation. (R. at 49, 252, 259, 262, 294-347, 349-50, 410.) Her most recent incarceration included imprisonment from at least May 2, 2006, through September 12, 2007. (R. at 294-347.)

The record shows that Musick was seen at Community Medical Care 1 from June 2005 through August 2005 for complaints of fatigue, low back pain, left leg pain, anxiety, depression and urinary pressure. (R. at 627-47.) On August 9, 2005, it was noted that Musick's symptoms of depression, anxiety and back pain were controlled. (R. at 630.)

On January 23, 2008, Dr. Mina Patel, M.D., evaluated Musick at the request of Disability Determination Services. (R. at 349-55.) Musick reported a long history of drug and alcohol abuse. (R. at 350.) Musick stated that she had attempted suicide at least six times, but denied any then-active suicidal thoughts. (R. at 351.) Dr. Patel diagnosed recurrent major depressive disorder without psychotic features, dysthymic disorder, generalized anxiety disorder and drug and alcohol abuse, in remission. (R. at 354.) Dr. Patel diagnosed Musick's then-current Global Assessment of Functioning score, ("GAF"),[8] at 55.[9] (R. at 354.) Dr. Patel reported that Musick was easily irritated and agitated, which could make it difficult for her to get along with people. (R. at 355.) Dr. Patel reported that Musick had difficulty being around a group of people, but that she "may do ok with one on one." (R. at 355.) Musick was found to have problems with concentration. (R. at 355.) Dr. Patel reported that Musick would be able to perform simple work-related activities. (R. at 355.)

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

On January 25, 2008, Howard S. Leizer, Ph.D., a state agency psychologist, completed a mental assessment reporting that Musick had a moderately limited ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 378-80.) Leizer found that Musick was markedly limited in her ability to understand, remember and carry out detailed instructions. (R. at 378.) Leizer found that Musick was able to meet the basic mental demands of competitive work on a sustained basis. (R. at 380.)

On March 3, 2008, Dr. Ravi Titha, M.D., examined Musick at the request of Disability Determination Services. (R. at 216-22.) Dr. Titha reported that Musick was in no acute distress. (R. at 219.) Her lungs were clear bilaterally, with no rales, wheezing or rhonchi. (R. at 219.) Neurological examination was normal. (R. at 216, 220.) Musick's appearance, behavior and speech were normal. (R. at 220.) Her thought process and content were normal. (R. at 220.) Concentration, attention, judgment and insight were normal. (R. at 220.) Dr. Titha diagnosed

generalized weakness/fatigue, hepatitis B/hepatitis C, bronchial asthma, fibromyalgia, low back and hip pain, generalized degenerative arthritis and tobacco dependence. (R. at 220.) Dr. Titha opined that Musick could sit, stand and walk five to six hours in an eight-hour workday with normal breaks. (R. at 221.) Dr. Titha opined that Musick could frequently lift and carry items weighing less than 10 to 15 pounds. (R. at 221.) Some limitation in bending, stooping, crouching and crawling was noted; however, Dr. Titha opined that Musick could frequently perform these activities. (R. at 221.) Dr. Titha found no limitations in Musick's abilities to handle, to feel or to grasp objects. (R. at 221.) No visual, communicative, workplace or environmental limitations were noted. (R. at 221.)

On March 24, 2008, Dr. Robert McGuffin, M.D., a state agency physician, reported that Musick had the residual functional capacity to perform light work. (R. at 381-87.) No postural, manipulative, visual or communicative limitations were noted. (R. at 383-84.) Dr. McGuffin found that Musick should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 384.)

On April 3, 2008, Musick was assessed by Cumberland Mountain Community Services, ("Cumberland Mountain"), for entrance into its Black Diamond Day Reporting Program. (R. at 410-20, 428-33.) Musick was required to participate in a day reporting program as a condition of her probation. (R. at 410.) She reported struggling with probation in the past due to continued drug use, which resulted in past violations and incarceration. (R. at 417.) Musick reported that the only medication that she was using was an Albuterol inhaler. (R. at 411.) Musick reported that she was the primary caregiver for her brother, who had cancer and

had recently undergone surgery. (R. at 417.) She reported that caring for her brother included administering his narcotic medication, which caused her "extreme drug cravings." (R. at 417.) It was reported that Musick's memory and concentration were intact, as well as her insight and judgment. (R. at 418.) Musick complained of depression and stressors and was referred to the psychiatric clinic at Cumberland Mountain for medication management. (R. at 439-41.) Her first medication check visit was on May 1, 2008. (R. at 438.) Musick reported that she was doing "pretty well." (R. at 438.)

As a whole, Musick generally reported an appropriate mood and affect; she maintained good eye contact; she usually exhibited a clear and logical thought process; her attention and concentration were normal; her energy was adequate; and she denied crying spells, panic attacks, suicidal ideation, paranoia, delusions, irritability and/or anger. (R. at 436-37, 473-78, 480-81, 489, 492, 494, 497, 500, 503, 507, 512, 518, 523, 527, 537, 554, 557, 559, 564, 575, 594, 605.) Musick reported that Suboxone treatment and depression medication helped her cope. (R. at 492-93, 500, 518, 523.)

On April 14, 2008, Musick was admitted to The Laurels for Suboxone treatment.[10] (R. at 388-95.) At the time of her admission, her urine drug screen was positive for methadone. (R. at 390.) Musick had no complications during the induction period. (R. at 390.) She was discharged on April 18, 2008, with a

---

[10] The record shows that Musick was admitted to The Laurels on May 27, 2005, and July 15, 2005, for detoxification. (R. at 396-99.)

diagnosis of opioid dependence. (R. at 390.) Her then-current GAF score was assessed at 50.[11] (R. at 390.)

On October 22, 2008, Dr. Michael Hartman, M.D., a state agency physician, reported that Musick had the residual functional capacity to perform light work. (R. at 444-50.) No postural, manipulative, visual or communicative limitations were noted. (R. at 446-47.) Dr. Hartman found that Musick should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 447.)

On October 24, 2008, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a mental assessment reporting that Musick had a moderately limited ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently

---

[11] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." *See* DSM-IV at 32.

of others. (R. at 451-53.) Tenison found that Musick was markedly limited in her ability to understand, remember and carry out detailed instructions and to interact appropriately with the general public. (R. at 451-52.) Tenison found that Musick was able to meet the basic mental demands of competitive work on a sustained basis. (R. at 453.)

That same day, Tenison completed a Psychiatric Review Technique form, ("PRTF"), indicating that Musick suffered from an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 454-68.) Tenison reported that Musick was moderately restricted in her activities of daily living and that she experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 464.) No repeated episodes of decompensation were noted. (R. at 464.) Tenison deemed Musick's statements partially credible. (R. at 467.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. § 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Mr. Musick argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment), ("Plaintiff's Brief"), at 6.) Mr. Musick contends that the ALJ failed to comply with the requirements of Social Security Ruling 00-4p by failing to ask the vocational expert whether her testimony was consistent with the DOT. (Plaintiff's Brief at 6-10.) Mr. Musick further argues that the actual DOT numbers provided by the vocational expert at the hearing do not match the job titles relied upon by the ALJ. (Plaintiff's Brief at 7.) Mr. Musick contends that substantial evidence does not exist to support the ALJ's finding that a significant number of jobs existed that Musick could perform. (Plaintiff's Brief at 8-10.) Additionally, Mr. Musick argues that the vocational expert's testimony did not properly address Musick's restriction to work that did not involve exposure to fumes. (Plaintiff's Brief at 9-10.) Finally, Mr. Musick argues that the ALJ failed to appropriately evaluate Dr. Titha's and Dr. Patel's opinions. (Plaintiff's Brief at 10-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ found that Musick had the residual functional capacity to perform a limited range of simple, routine, repetitive light work that did not require more than occasional climbing of ramps and stairs, that did not require her to work around hazardous machinery, excessive fumes, dust or temperature extremes, that did not require more than frequent reaching, that did not require more than occasional stooping, bending and kneeling, that did not require her to climb

ladders, ropes or scaffolds, that did not require her to work jobs requiring food preparation or other jobs affected by hepatitis C, that allowed her to take a break every two hours and that did not require her to have direct contact with the public. (R. at 33.) In making this finding, the ALJ noted that he was giving "great" weight to the opinions of Drs. McGuffin and Hartman, noting that their opinions were not inconsistent with the opinions of Dr. Titha. (R. at 34.) The ALJ also gave "great" weight to Dr. Patel's opinion, and he observed that Leizer and Tenison determined that Musick could perform the basic mental demands of competitive unskilled work on a sustained basis. (R. at 35, 355, 380, 453.)

Mr. Musick contends that the ALJ failed to properly evaluate Drs. Titha and Patel's opinions. (Plaintiff's Brief at 10-14.) .) After a review of the evidence of record, I find Mr. Musick's argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2013). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[12] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

---

[12] *Hunter* was superseded by former 20 C.F.R. § 416.927(d)(2), now renumbered as § 416.927(c)(2), which states, in relevant part, as follows: If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

In particular, Mr. Musick argues that Dr. Titha's opinion deviated from the ALJ's residual functional capacity assessment. (Plaintiff's Brief at 10-11.) Dr. Titha noted that Musick could sit, stand and walk five to six hours in an eight-hour workday with normal breaks and frequently lift and carry items weighing less than 10 to 15 pounds. (R. at 221.) Dr. Titha identified no restriction on Musick's ability to lift and carry occasionally. (R. at 221.) Mr. Musick contends that Dr. Titha's opinion restricted Musick to sedentary work.[13] (Plaintiff's Brief at 11.) While Musick had some lumbosacral spine tenderness and a "mild" restriction of the range of motion of her dorsolumbar spine and hip flexion, her examination findings were unremarkable. (R. at 216, 220-21.) Musick retained full strength in her upper and lower extremities, her sensation was intact, and her straight-leg raising test result was negative. (R. at 220.) Drs. McGuffin and Hartman both found that Musick had the residual functional capacity to perform light work that did not require her to work around concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 381-87, 444-50.)

Mr. Musick also contends that Dr. Patel's opinion "clearly references all interactions with people." (Plaintiff's Brief at 11.) Dr. Patel found that Musick was easily irritated and agitated, which could make it difficult for her to get along with people. (R. at 355.) He reported that Musick would have difficulty being around a group of people, but that she "may do ok with one on one." (R. at 355.) While state agency psychologists Leizer and Tenison found that Musick had moderate

---

[13] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 416.967(a) (2013). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a) (2013).

limitations in her ability to get along with co-workers or peers, they both found that she had the residual functional capacity to perform the basic mental demands of competitive work. (R. at 378-80, 451-53.) Dr. Titha reported that Musick's appearance, behavior and speech were normal. (R. at 220.) Her thought processes and content were found to be normal. (R. at 220.) Dr. Titha reported that Musick's concentration, attention, judgment and insight were normal. (R. at 220.) Musick continuously reported an appropriate mood and affect; she maintained good eye contact; she usually exhibited a clear and logical thought process; her attention and concentration were normal; her energy was adequate; and she denied crying spells, panic attacks, suicidal ideation, paranoia, delusions, irritability and/or anger. (R. at 436-37, 473-78, 480-81, 489, 492, 494, 497, 500, 503, 507, 512, 518, 523, 527, 537, 554, 557, 559, 564, 575, 594, 605.) Musick reported that Suboxone treatment and depression medication helped her cope. (R. at 492-93, 500, 518, 523.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Based on my review of the record, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence in determining that Musick had the residual functional capacity to perform a limited range of light work.

Mr. Musick contends that the ALJ failed to comply with the requirements of Social Security Ruling 00-4p by failing to ask the vocational expert whether her testimony was consistent with the DOT. (Plaintiff's Brief at 6-10.) Mr. Musick further argues that the actual DOT numbers provided by the vocational expert at the hearing do not match the job titles relied upon by the ALJ. (Plaintiff's Brief at 7.) Mr. Musick also contends that substantial evidence does not exist to support the ALJ's finding that a significant number of jobs existed that Musick could

perform. (Plaintiff's Brief at 8-10.) More specifically, Mr. Musick contends that the ALJ erred by relying upon testimony which was not consistent with the DOT without attempting to resolve the conflict, as required by Social Security Ruling 00-4p. Social Security Ruling 00-4p instructs, in part, the following:

> This Ruling clarifies our standards for the use of vocational experts [] who provide evidence at hearings before administrative law judges …. In particular, this ruling emphasizes that before relying on [vocational expert] … evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] … and information in the Dictionary of Occupational Titles …, and Explain in the determination or decision how any conflict that has been identified was resolved.
>
> . . .
>
> Occupational evidence provided by a [vocational expert] … generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] … evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] … evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> . . .
>
> When a [vocational expert] … provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] … evidence and information provided in the DOT.

In these situations, the adjudicator will:

> Ask the [vocational expert] … if the evidence he or she has provided conflicts with information provided in the DOT; and

> If the [vocational expert's] … evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

S.S.R. 00-4p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.).

The vocational expert, here, testified that there was a significant number of housekeeper jobs available that Musick could perform. (R. at 65-66.) The vocational expert identified the job with occupational code 302.685-010 in the DOT as a housekeeping job that Musick could perform. (R. at 65-66.) A review of the DOT shows that occupational code 302.685-010 is for the job of laundry worker, domestic. *See* I DICTIONARY OF OCCUPATIONAL TITLES laundry worker, domestic, occupational code 302.685-010 at 239 (4th ed. rev. 1991). The vocational expert also identified the job with occupational code 294.667-010 as a general office clerk job that Musick could perform. (R. at 65-66.) Occupational code 294.667-010 is for the job of auction assistant. *See* I DICTIONARY OF OCCUPATIONAL TITLES auction assistant, occupational code 294.667-010 at 234.

In this case, the ALJ failed to ask the vocational expert if the evidence she provided conflicted with information in the DOT. Under the Commissioner's own ruling, the ALJ is under an affirmative duty to inquire into conflicts between the vocational expert's testimony and the DOT. *See Haddock v. Apfel*, 196 F.3d 1084,

1087 (10th Cir. 1999) ("We hold that before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."); *see also Oxendine v. Massanari*, 181 F. Supp. 2d 570, 573-75 (E.D.N.C. 2001) (concluding that the Fourth Circuit has adopted the rule set out in *Haddock,* noted *supra*, therefore adopting SSR 00-4p); *but cf. Justin v Massanari*, No. 01-1447, 20 F. App'x 158, *160 (4th Cir. Oct. 2, 2001) (unpublished) (noting that AR 00-3(10),[14] even if applicable outside the Tenth Circuit, only requires an ALJ to address evident discrepancies between a vocational expert's testimony and the DOT, and specifically declines to place an obligation on ALJs to uncover such discrepancies) (citing A.R. 00-3(10), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.) and S.S.R. 00-4p; *but see* S.S.R. 00-4p, ("At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is [consistency between the vocational expert's testimony and the DOT]," and "[w]hen a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] … evidence and information provided in the DOT."); *see also Gull v. Barnhart*, 2006 WL 1982769, at *9 (W.D. Va. July 14, 2006) (unpublished) ("Remand is also appropriate because of the ALJ's failure to inquire about any possible inconsistencies between the [vocational expert's] testimony and the DOT."); *see also Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 42836, at *56-57

---

[14] Acquiescence Ruling 00-3(10) rules on the implications of *Haddock* in the Tenth Circuit.

(N.D. W.Va. Sept. 12, 2005) (unpublished) (finding that the ALJ correctly applied SSR 00-4p by inquiring whether there were any conflicts between the vocational expert's testimony and the DOT). The ALJ, therefore, erred by not asking the vocational expert if the evidence she provided conflicted with information in the DOT.

Moreover, I find that the ALJ failed to establish that sufficient numbers of light exertion jobs were available to Musick. The vocational expert identified 338,044 jobs existed in the broad category of housekeeping work, but the vocational expert did not offer testimony regarding the number of jobs available for the specific job identified. (R. at 65-66.) Under the DOT, housekeeping work is categorized within the "service occupations" category. I note that the housekeeping/cleaning jobs identified in the DOT are found in category 301 for household and related work; 321 for housekeepers, hotels and institutions; and 323 for housecleaners, hotels, restaurants and related establishments. For example,

1. Housekeeper, Home (domestic serv.) alternate titles: manager, household. The DOT notes the exertional requirement to perform this job as light. The DOT also notes that the general educational development, ("DOT GED"), for this occupation is R4 M2 L3.[15] *See* I DICTIONARY OF OCCUPATIONAL TITLES, housekeeper, home, occupational code 301.137-010 at 239;

---

[15] The DOT GED embraces those aspects of education, formal and informal, which are required of the worker for satisfactory job performance. The DOT GED scale is composed of three divisions: Reasoning Development, ("R"), Mathematical Development, ("M"), and Language Development, ("L"). *See* II DICTIONARY OF OCCUPATIONAL TITLES, Components of the Definition Trailer at 1009, 1012 (4th ed. rev. 1991).

2.      House Worker, General (domestic serv.) alternate titles: housekeeper, home. The DOT notes the exertional requirement to perform this job as medium.[16] The DOT GED for this occupation is R3 M2 L2. *See* I DICTIONARY OF OCCUPATIONAL TITLES, house worker, general, occupational code 301.474-010 at 239;

3.      Housekeeper (hotel & rest.; medical ser.; real estate) alternate title: floor housekeeper. The DOT notes the exertional requirement to perform this job as light. The DOT GED for this occupation is R3 M2 L3. *See* I DICTIONARY OF OCCUPATIONAL TITLES, housekeeper, occupational code 321.137-010 at 247;

4.      Cleaner, Hospital (medical ser.) alternate titles: housekeeper, hospital. The DOT notes the exertional requirement to perform this job as medium. The DOT GED for this occupation is R2 M1 L2. *See* I DICTIONARY OF OCCUPATIONAL TITLES, cleaner, hospital, occupational code 323.687-010 at 248;

5.      Cleaner, Housekeeping (any industry) alternate title: maid. The DOT notes the exertional requirement to perform this job as light. The DOT GED for this occupation is R1 M1 L1. *See* I DICTIONARY OF OCCUPATIONAL TITLES, cleaner, housekeeping, occupational code 323.687-014 at 248; and

6.      Housecleaner (hotel & rest.) alternate titles: hall cleaner, mover, night cleaner. The DOT notes the exertional requirement to perform this job as heavy.[17] The DOT GED for this occupation is R2 M1 L1. *See* I DICTIONARY OF OCCUPATIONAL TITLES, housecleaner, occupational code 323.687-018 at 248.

---

[16] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2013).

[17] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, she also can do sedentary, light and medium work. *See* 20 C.F.R. § 416.967(d) (2013).

The vocational expert's testimony is unclear as to whether the number of jobs listed is the number of only light exertion housekeeping jobs.

In addition, under the DOT, general office clerk work is categorized within the "clerical and sales occupations" category. I note that the general office clerk jobs identified in the DOT are found in category 209 for stenography, typing, filing and related occupations; 219 for computing and account-recording occupations; and 239 for information and message distribution occupations. *See* I DICTIONARY OF OCCUPATIONAL TITLES, Three-Digit Occupational Groups at xxx-xxxi.  For example,

1. Clerk, General (clerical) alternate titles: office clerk, routine. The DOT notes the exertional requirement to perform this job as light. The DOT GED for this occupation is R3 M2 L3. *See* I DICTIONARY OF OCCUPATIONAL TITLES, clerk, general, occupational code 209.562-010 at 180;

2. Administrative Clerk (clerical) alternate titles: clerk, general office.  The DOT notes the exertional requirement to perform this job as light. The DOT GED for this occupation is R4 M3 L3. *See* I DICTIONARY OF OCCUPATIONAL TITLES, administrative clerk, occupational code 219.362-010 at 191; and

3. Office Helper (clerical). The DOT notes the exertional requirement to perform this job as light. The DOT GED for this occupation is R2 M2 L2. *See* I DICTIONARY OF OCCUPATIONAL TITLES, office helper, occupational code 239.567-010 at 210.

Because the vocational expert's testimony is not clear and because some of the housekeeping jobs the vocational expert identified are listed in the DOT as requiring medium exertion, it is not possible for the undersigned to identify how

many of these jobs require only light exertion. Furthermore, the DOT GED for occupational codes 321.137-010, 209.562-010 and 219.362-010 indicate that these occupations require a general education development in language at "L3," which requires an individual to "speak before an audience...." II DICTIONARY OF OCCUPATIONAL TITLES, Components of the Definition Trailer at 1011. The occupational codes for 301.137-010 and 219.362-010 indicate that these occupations require a general education development in reasoning development at "R4," which requires an individual to "apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists." II DICTIONARY OF OCCUPATIONAL TITLES, Components of the Definition Trailer at 1010. The occupational codes for 323.687-010, 323.687-018 and 239.567-010 indicate that these occupations require a general education development in reasoning development at "R2," which requires an individual to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." II DICTIONARY OF OCCUPATIONAL TITLES, Components of the Definition Trailer at 1011. Dr. Patel found that Musick would have difficulty being around a group of people. (R. at 355.) State agency psychologists Leizer and Tenison found that Musick was markedly limited in her ability to understand, remember and carry out detailed instructions, (R. at 378, 451), and Tenison found that Musick had a markedly limited ability to interact appropriately with the general public. (R. at 452.) Furthermore, the ALJ found that Musick was limited to simple, routine, repetitive light work that did not require her to have direct contact with the public. (R. at 33.)

For all of the above reasons, I find that substantial evidence does not support the ALJ's finding that a significant number of jobs existed in the economy that Musick could perform.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding with regard to Musick's residual functional capacity;

2. Substantial evidence does not exist in the record to support the ALJ's finding that a significant number of jobs exist that Musick could perform; and

3. Substantial evidence does not exist in the record to support the ALJ's finding that Musick was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Mr. Musick's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further development in accordance with this Report and Recommendation.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     December 6, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGe